**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**ALBANY DIVISION**

| | | |
|---|---|---|
| LINDSEY MOODY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action File No. |
| v. | ) | |
| | ) | _____ |
| PHOEBE PUTNEY MEMORIAL | ) | |
| HOSPITAL, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

COMES NOW the Plaintiff LINDSEY MOODY (hereafter "Moody") and files this Complaint against the Defendant PHOEBE PUTNEY MEMORIAL HOSPITAL, INC. (hereafter "Phoebe") and shows the Court as follows:

## INTRODUCTION

1.

Moody was terminated from her employment as a nurse with Phoebe on February 1, 2019. Phoebe terminated Moody just prior to the five-year anniversary of her initial hire. At the time of her termination Moody was a nurse in the Intensive Care Unit (ICU), was pregnant, and was operating under an accommodation from Phoebe for a diagnosed disability (Acute Stress Reaction (ASR)). This disability was specific to her gender, pregnancies, and other maternity issues. Phoebe terminated Moody based on an alleged violation of the Health Insurance Portability and Accountability Act (HIPAA); this was pretext. Moody did not violate HIPAA. Rather, Phoebe terminated Moody with malicious intent. The real reason Phoebe terminated Moody was unlawful. This is a complaint for legal and equitable relief, damages, and attorney's

fees and costs to redress Phoebe's torts against Moody, as well as Phoebe's violations of Moody's rights secured to her under federal civil rights law.   Moody raises claims of wrongful termination, defamation, tortious interference with contractual or business relations, Title VII Gender Discrimination violations, and Americans With Disabilities Act violations.

PARTIES

2.

Moody is an individual, a female, and a resident of Dougherty County, Georgia.

3.

Defendant Phoebe is a hospital and a corporation incorporated under the laws of the State of Georgia.  Phoebe receives public funding.  Phoebe is a resident of Albany, Dougherty County, Georgia.

JURISDICTION & VENUE

4.

Federal subject matter jurisdiction exists pursuant to 28 U.S.C. §§ 1331, 1343(a)(3),(4), 1367, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.

5.

This court has personal jurisdiction over Phoebe.

6.

Venue is proper in this court under 28 U.S.C. § 1391(b).

EEOC PREREQUISITES

7.

Moody filed her Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) within 180 days of her termination.

8.

Moody received a Right to Sue from the EEOC on May 21, 2019, which is attached to this Complaint as Exhibit A.

FACTS

9.

Moody graduated with her Bachelor of Science in Nursing on May 4, 2013.

10.

Moody was licensed in Georgia as a Registered Professional Nurse on September 23, 2013.

11.

Phoebe hired Moody on March 3, 2014 as a "Unit RN."

12.

Moody's infant son, who was born on April 27, 2017, died from Sudden Infant Death Syndrome (SIDS) on May 19, 2017.

13.

After the death of her son, Moody was being treated for depression and anxiety and was diagnosed with Acute Stress Reaction (ASR).

14.

On February 5, 2018, Phoebe granted Moody's request for a change in status from full time to part time.

15.

On or about August 16, 2018, Moody filled out Standard Insurance Company's Certification of Health Care Provider for Employee's Serious Health Condition, and delivered it

to Phoebe, in relationship to her request for accommodations to her depression, anxiety, and ASR.

16.

Phoebe granted accommodations to Moody as to her disability in the form of approved intermittent absences from August 3, 2018 through February 15, 2019.

17.

Throughout her tenure at Phoebe, Phoebe gave Moody annual evaluations.  Moody met, or exceeded, Phoebe's standards and requirements in her annual evaluations.

18.

Phoebe's ICU is very demanding; as a result, every employee in the ICU is required to interact with every patient, as a team, in order for the ICU to function.

19.

Phoebe's own policy "Pledge of Professionalism/I Promise" requires Phoebe's employees to "promote a spirit of teamwork and collaboration, recognizing that all members make important contributions to the team and that patient safety and quality of care are enhanced by a collaborative approach to patient care."

20.

This policy goes on to further "encourage input from all team members and never assume that expertise is overruled by age, profession, or rank."

21.

Moody's supervisors at Phoebe needed to maximize the use of personnel when covering various needs of the unit such as responding to patient alert alarms and other medical needs.

22.

Moody became pregnant in late September 2018 and has a due date of June 24, 2019.

23.

Moody was visibly pregnant as early as December 2018, and Phoebe was aware that Moody was pregnant at the time of her termination.

24.

In late 2018 and early 2019, Moody learned that her supervisors began complaining about her taking breaks or not working enough to meet the needs of the ICU.

25.

In early 2019, Moody began to receive numerous communications from her supervisors, or other employees of Phoebe, begging her to come to work at times Moody was not scheduled to work, or was on leave under her approved accommodations.

26.

On or about January 22, 2019, a patient died who was under the care of Phoebe's ICU health care team, of which Moody was a part.

27.

After the patient's death, Moody and several other ICU employees were interviewed by various supervisors and members of Phoebe's management team regarding the deceased patient's medical record.

28.

Several members of management or supervisors requested that Moody and various other employees in the ICU to write handwritten statements as to their recollection of the events surrounding the deceased patient's care and death while in the ICU.

29.

Moody and the other ICU employees were directed that these statements would not be logged in to PERTS (an electronic logging system Phoebe utilizes in the ordinary course of business).

30.

After management's request that members of the patient's ICU team assemble information on the medical condition, status, and death of the patient, Marlene Fincher, Kim Fulmer, members of Phoebe's management team, Moody's supervisors, and other agents of Phoebe, met with Moody.

31.

In the presence of Marlene Fincher and Kim Fulmer, and at their direction, Moody accessed the deceased patient's medical record, and printed portions of the patient's medical record, and gave a copy of it to Fincher and Fulmer.

32.

Later that day, Marlene Fincher reminded Moody to complete her own handwritten statement to be given to management regarding the medical condition and circumstances leading to the patient's death.

33.

At Fincher's request, Moody again accessed the patient's medical record, completed her handwritten statement, and gave it to Moody's shift supervisor, Holly Bradley, to turn in to management.

34.

On February 1, 2019, Phoebe terminated Moody from her employment allegedly for a "HIPAA violation."

35.

This termination was based on the following grounds:  "Lindsey accessed a patient's chart several hours after the patient's death.  She was not the primary nurse of this patient nor the charge nurse for this shift.  She made no documented notes in the chart but accessed multiple parts of the chart."

36.

Upon Moody's termination, Phoebe reported Moody's alleged HIPAA violations to the Office of Civil Rights (OCR).

37.

Upon Moody's termination, Phoebe reported Moody's alleged HIPAA violations to the family of the deceased patient.

38.

Phoebe's statement that, "She made no documented notes in the chart but accessed multiple parts of the chart," is consistent with Phoebe's direction that Moody write a handwritten statement, which should not be electronically logged, regarding the deceased patient's medical condition.

39.

Phoebe's statement that Moody was "not the primary nurse of this patient nor the charge nurse for this shift" is inconsistent with Phoebe's policies and the requirements of the job duties of an ICU nurse.

40.

Moody's actions were done at the request of Phoebe and in the presence of Phoebe's agents.

41.

Moody was a primary member of the deceased patient's health care team.  As such Moody was a member of the deceased patient's workforce who needed access to protected health information (PHI) to carry out her duties.

42.

Moody's access of the PHI contained in the deceased patient's medical record was done in good faith.

43.

Moody's access of the PHI contained in the deceased patient's medical record was done within the scope of her authority to carry out her job duties.

44.

Moody's access of the PHI contained in the deceased patient's medical record was done acting under the actual authority of Phoebe.

45.

Moody's access of the PHI contained in the deceased patient's medical record was done consistent with Phoebe's HIPAA policies.

46.

None of Moody's actions described above are violations of HIPAA, nor any of Phoebe's HIPAA policies.

47.

Moody was fired for some other reason which was not disclosed to Moody.

48.

On April 8, 2019, Moody sent Phoebe a letter requesting reinstatement, back pay for lost wages and benefits, reversal of disciplinary action and termination, no further disciplinary action, and retraction of the defamation to her reputation resulting from the alleged HIPAA violation.

49.

Moody's April 8, 2019 letter requested a full retraction of the defamation to her reputation resulting from the alleged HIPAA violation, disciplinary action, and termination.

50.

Phoebe designated Attorney Louis E. Hatcher with the law firm of Watson Spence, LLC, in Albany, Georgia, to respond to and handle Moody's claims.

51.

On May 7, 2019, by means of a letter from Hatcher, Phoebe rejected all of Moody's requests and refused to respond to any of Moody's allegations or claims.

52.

Prior to filing this lawsuit, Phoebe decline to engage in any settlement discussions with Moody, despite Moody's numerous invitations to do so.

53.

Phoebe's May 7, 2019 letter from Hatcher did not contain any explanation as to the alleged HIPAA violation.

54.

Hatcher specializes in healthcare law, employment law, and HIPAA compliance; and has obtained Compliance Certification Board (CCB) certifications in Healthcare Compliance and Healthcare Privacy Compliance.

55.

Hatcher refused to respond to Moody's allegations or claims in Moody's April 8, 2019 letter.

## COUNT 1:  BREACH OF CONTRACT (WRONGFUL TERMINATION)/BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

56.

Plaintiff incorporates by reference paragraphs 1 through 55 as if fully set forth herein.

57.

Phoebe entered into a contract for employment with Moody.

58.

In this employment contract, Moody agreed to work for Phoebe as a nurse in the ICU.

59.

In this employment contract, Phoebe agreed to compensate Moody for her work in the ICU with money and benefits.

60.

In this employment contract, Moody agreed to follow Phoebe's policies, including not violating Phoebe's HIPAA policies.

61.

Phoebe's policies, including its HIPPA policies, required Phoebe to act reasonably with respect to any alleged violation of HIPAA.

62.

Phoebe breached its duties to act reasonably under the terms of the policies inherent in Phoebe's contract of employment with Moody.

63.

As a direct and proximate cause of Phoebe's breach, Moody suffered damages.

64.

Inherent in every contract is the covenant of good faith and fair dealing.

65.

Phoebe breached this covenant of good faith and fair dealing.

66.

As a direct and proximate cause of Phoebe's breach, Moody suffered damages.

## COUNT 2:  LIBEL

67.

Plaintiff incorporates by reference paragraphs 1 through 66 as if fully set forth herein.

68.

Phoebe's statement that Moody violated HIPAA, and subsequent discipline and termination of Moody, injured Moody's reputation and exposed her to public hatred, contempt, or ridicule.

69.

Phoebe's statements that Moody violated HIPAA, and subsequent discipline and termination of Moody, were done with malicious intent.

70.

Phoebe's statements that Moody violated HIPAA, and subsequent discipline and termination of Moody was published to the Office of Civil Rights (OCR).

71.

Phoebe's statements that Moody violated HIPAA, and subsequent discipline and termination of Moody was published to the family of the deceased patient.

72.

Phoebe's statements that Moody violated HIPAA, and subsequent discipline and termination of Moody was published within the Phoebe hospital system.

73.

Phoebe's statements that Moody violated HIPAA, and subsequent discipline and termination of Moody, was published to various members of the community, her peers, and potential employers in Albany and Dougherty County, Georgia.

74.

Phoebe owns or controls suitable and comparable places of employment for Moody within Moody's reasonable daily job travel radius.

75.

As a direct and proximate cause of Phoebe's libel, Moody suffered damages, including special damages, including damages to her reputation and loss of employment opportunities.

76.

Moody requested a retraction of Phoebe's defamatory statements, but Phoebe refused to retract, correct, or explain the libelous statements.

77.

Moody specifically pleads punitive damages for Phoebe's libel.

**COUNT 3:  SLANDER**

78.

Plaintiff incorporates by reference paragraphs 1 through 77 as if fully set forth herein.

79.

Phoebe's statements that Moody violated HIPAA, and subsequent discipline and termination of Moody, were disparaging words that produced special damages that flowed naturally therefrom.

80.

Phoebe's statements that Moody violated HIPAA, and subsequent discipline and termination of Moody, were charges against her in reference to her trade, office, or profession calculated to injure her.

81.

Phoebe's statements that Moody violated HIPAA, and subsequent discipline and termination of Moody, were done with malicious intent.

82.

Phoebe's statements that Moody violated HIPAA, and subsequent discipline and termination of Moody was published to the Office of Civil Rights (OCR).

83.

Phoebe's statements that Moody violated HIPAA, and subsequent discipline and termination of Moody was published to the family of the deceased patient.

84.

Phoebe's statements that Moody violated HIPAA, and subsequent discipline and termination of Moody was published within the Phoebe hospital system.

85.

Phoebe's statements that Moody violated HIPAA, and subsequent discipline and termination of Moody, was published to various members of the community, her peers, and potential employers in Albany and Dougherty County, Georgia.

86.

Phoebe owns or controls suitable and comparable places of employment for Moody within Moody's reasonable daily job travel radius.

87.

As a direct and proximate cause of Phoebe's libel, Moody suffered damages, including special damages, including damages to her reputation and loss of employment opportunities.

88.

Moody requested a retraction of Phoebe's defamatory statements, but Phoebe refused to retract, correct, or explain the slanderous statements.

89.

Moody specifically pleads punitive damages for Phoebe's slander.

**COUNT 4:  TORTIOUS INTERFERENCE WITH CONTRACTUAL/BUSINESS RELATIONS**

90.

Plaintiff incorporates by reference paragraphs 1 through 89 as if fully set forth herein.

91.

Phoebe's statements that Moody violated HIPAA, and subsequent discipline and termination of Moody, were made without privilege.

92.

Phoebe's statements that Moody violated HIPAA, and subsequent discipline and termination of Moody, were made with malicious intent to injure.

93.

Phoebe's statements that Moody violated HIPAA, and subsequent discipline and termination of Moody, caused future employers to discontinue or fail to enter in to an anticipated employment relationship with Moody.

94.

As a direct and proximate cause of Phoebe's statements, Moody suffered damages, including special damages.

**COUNT 5:  TITLE VII GENDER DISCRIMINATION**

95.

Plaintiff incorporates by reference paragraphs 1 through 94 as if fully set forth herein.

96.

This is a claim against Phoebe for the intentional discrimination against Moody because of her gender, namely that she was pregnant or receiving accommodations due to a disability related to pregnancy, childbirth, and the death of a child, in violation of Title VII.

97.

Moody was pregnant at the time of her termination, on February 1, 2019, and therefore is a member of a protected class.

98.

Moody was female, and was utilizing accommodations granted to her by Phoebe as a result of childbirth, maternity leave, death of a child, and subsequent disabilities resulting therefrom (characteristics inherent to Moody's gender); as such Moody was a member of a protected class, during the time of her employment and termination from Phoebe.

99.

Moody's membership in this protected class was a motivating factor in Phoebe's decision to terminate her employment.

100.

As a proximate result of Phoebe's unlawful intentional discrimination against Moody, she suffered financial loss, economic loss, loss of employment, shame, humiliation, emotional distress, and trauma.

**COUNT 6:  DISCRIMINATION ON THE BASIS OF DISABILITY (ADA)**

101.

Plaintiff incorporates by reference paragraphs 1 through 100 as if fully set forth herein.

102.

This is a claim against Phoebe for the intentional discrimination against Moody because of her disability, namely that she was pregnant or receiving accommodations due to a disability related to pregnancy, childbirth, maternity leave, and the death of a child, in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12111 et seq.

103.

Moody was a qualified individual with a known disability who with reasonable accommodations could perform the functions of her job as an ICU nurse at Phoebe.

104.

Moody meets the definition under the ADA of a qualified individual with a disability.

105.

Phoebe meets the definition of a covered entity within the meaning of the ADA.

106.

Phoebe granted Moody her requested accommodations for her documented disability.

107.

Moody's disability was a motivating factor when Phoebe terminated Moody and later failed to retract, correct, or reinstate.

108.

As a proximate result of Phoebe's unlawful intentional discrimination against Moody, she suffered financial loss, economic loss, loss of employment, shame, humiliation, emotional distress, and trauma.

**COUNT 7:  CONSEQUENTIAL, SPECIAL & EMOTIONAL DAMAGES**

109.

Plaintiff incorporates by reference paragraphs 1 through 108 as if fully set forth herein.

110.

As a direct and proximate cause of Phoebe's acts and omissions, Moody suffered damages, including nominal, compensatory, consequential, special, and emotional damages. Moody suffered lost pay and benefits, lost job opportunities, financial loss, and increased stress which caused Moody to become ill, depressed, anxious, and sleep deprived as a result of Phoebe's acts and omissions.  This is not an exhaustive list of Moody's damages.

111.

Moody's pregnancy and disabilities at the time of her employment and termination caused her additional special damages emotionally and financially.

**COUNT 8:  PUNITIVE DAMAGES**

112.

Plaintiff incorporates by reference paragraphs 1 through 111 as if fully set forth herein.

113.

The actions of Phoebe show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences.

114.

Punitive damages should be awarded against Phoebe in an amount sufficient to deter, penalize, and punish Phoebe in light of the circumstances of this case, as provided in O.C.G.A. § 51-12-5.1.

## COUNT 9:  ATTORNEY'S FEES & COSTS OF LITIGATION

115.

Plaintiff incorporates by reference paragraphs 1 through 114 as if fully set forth herein.

116.

Phoebe has acted in bad faith, has been stubbornly litigious, and has caused Moody unnecessary trouble and expense, therefore making Phoebe liable to Moody for her attorney's fees and expenses of litigation under O.C.G.A. § 13-6-11.

117.

Moody is entitled to attorney's fees and costs of litigation under 42 U.S.C. §§ 1988, 12205.

## COUNT 10:  DECLARATORY, INJUNCTIVE & EQUITABLE RELIEF

118.

Plaintiff incorporates by reference paragraphs 1 through 117 as if fully set forth herein.

119.

Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201, 2202, and Fed. R. Civ. P. 65.

120.

Phoebe owes Moody equitable relief based on their acts and omissions, and Moody specifically demands equitable relief to make Moody whole.

121.

Specifically, Moody requests reinstatement, cease and desist from further disciplinary action and retaliation, back pay, front pay, lost benefits, retraction, correction of her disciplinary and personnel file, and neutral reporting to all future employers and reference inquires.

122.

Moody reserves the right to request such further equitable or injunctive relief which may be revealed as necessary to make Moody whole, which may be revealed through discovery or at trial.

**WHEREFORE,** having fully stated her Complaint, Plaintiff prays:

a.      that Defendant be ordered to reinstate Plaintiff;

b.      that Defendant be ordered to correct Plaintiff's personnel file by reversing the discipline and termination related to the alleged HIPAA violation;

c.      that Defendants be ordered to pay Plaintiff compensation, compensatory damages, front pay, back pay, lost benefits, lost retirement benefits, reasonable attorney fees, court costs, and expenses;

d.      that declaratory and equitable relief and a permanent injunction restraining Defendant from further wrongful discipline and retaliation against Plaintiff;

e.      that Plaintiff be awarded consequential, nominal, compensatory, and special damages as against Defendant to compensate Plaintiff for her mental and

emotional distress, anxiety, humiliation, loss of professional and personal reputation, and opportunities, as a consequences of the Defendant's various unlawful and tortious conduct, including loss of enjoyment of life, in an amount to be determined by the enlightened conscience of a jury;

h.      that Plaintiff have a judgment entered in her favor and against Defendant, for all her damages allowed under law;

i.      that Plaintiff recover punitive damages against Defendant in an amount to be determined by the enlightened conscience of a jury, an amount to deter Defendant and others from similar conduct;

k.      that Plaintiff recover her attorney's fees, costs, and expenses of litigation as permissible under law;

l.      that Defendant be ordered to render specific performance equitable relief to Plaintiff as stated in the Complaint;

m.      that Plaintiff be granted a trial by jury on all issues so triable;

n.      that all costs of the action be cast upon Defendant;

o.      that Defendant be ordered to pay pre-judgment and post-judgment interest according to law; and

p.      that this Court order such other, further, and different relief as this Court deems just and proper.

Respectfully submitted this 6th day of August, 2019.

/s/ Holly H. Maestas_____
HOLLY HANCE MAESTAS
Ga. Bar No. 153092
P.O. Box 2174
Peachtree City, Georgia 30269
Tel:  (229) 588-1688
E-mail:  hhmattorney@gmail.com
Attorney for Plaintiff